IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

| | |
|---|---|
| **UNITED STATES OF AMERICA,** <br><br> Plaintiff, <br><br> v. <br><br> **STERLING H. ROBERTS,** <br><br> Defendant. | Case No. **3:18-CR-032 (1)** <br><br><br> **JUDGE THOMAS M. ROSE** |

**UNITED STATES' RESPONSE TO DEFENDANT'S MOTION IN LIMINE TO EXCLUDE ATTORNEY-CLIENT PRIVILEGED COMMUNICATIONS**

The United States respectfully submits the attached memorandum in response to Defendant's motion to exclude communications between Defendant and Lori Cicero. Because the communications are not protected by attorney-client privilege, Defendant's statements to Cicero on August 8, 2017 are admissible at trial.

    Respectfully submitted,

    VIPAL J. PATEL
    Acting United States Attorney


    s/Kevin Koller
    KEVIN KOLLER (NY 5180609)
    AMY M. SMITH (0081712)
    SHEILA G. LAFFERTY (0042554)
    Assistant United States Attorneys
    Attorneys for Plaintiff
    221 E. Fourth Street, Suite 400
    Cincinnati, Ohio  45202
    Office:  (513) 694-3711
    E-mail: Kevin.Koller@usdoj.gov
    E-mail: Amy.Smith2@usdoj.gov
    E-mail: Sheila.Lafferty@usdoj.gov

**MEMORANDUM**

Defendant Sterling Roberts moves this court to exclude communications between him and Lori Cicero, an attorney for the victim Bobby Caldwell, made on an August 8, 2017 phone call. (R. 317, mtn. at PageID # 1705–12; R. 344, mem. at PageID # 2317–23.) The court should deny the motion because the communications are not protected by attorney-client privilege. First, the privilege does not apply because no attorney-client relationship existed between Roberts and Cicero, who was not acting as a legal advisor to Roberts and explicitly told him she was not his lawyer. Second, the purpose of the communications was not to provide or solicit any legal advice, but rather for Roberts to provide information to Cicero in her capacity as Caldwell's lawyer in an ongoing custody dispute. Third, the privilege also does not apply because Roberts did not intend for the communications to be confidential and specifically asked that Cicero record the call, not keep it confidential.

**I.     Background**

Lori Cicero is an attorney licensed to practice in Ohio since 2005. (R. 324, hearing tr. at PageID # 2070.) Cicero first met Sterling Roberts in 2006, when she was assigned to serve as his court-appointed attorney on burglary charges. (*Id.* at PageID # 2073–74; *see also* Gov't Ex. 6A.) Because Cicero was court-appointed, and not retained, she did not send Roberts an engagement letter or enter into any kind of retainer agreement with him. (R. 324, hearing tr. at PageID # 2078.) Rather, the court paid her fees, and the representation was limited to the specific charges. (*Id.*)

In 2008, Cicero was again assigned as court-appointed counsel for Roberts, who was indicted in August 2008 on charges of illegal processing of a drug document. (*Id.* at PageID # 2079; *see also* Gov't Ex. 7A; Gov't Ex. 7B.) As with the 2006 case, the representation was limited to the specific charges, and Cicero did not enter into any fee arrangement or retainer

2

agreement with Roberts. (R. 324, hearing tr. at PageID # 2081–82.) Cicero's representations of Roberts ended on January 29, 2009, when both the 2006 and 2008 cases were terminated. (*Id.* at PageID # 2082; Gov't Ex. 6A; Gov't Ex. 7A.). Since January 2009, Cicero has never represented Roberts, and Roberts has never sought legal advice from her. (R. 324, hearing tr. at PageID # 2079, 2093–94.) Roberts has been involved in several criminal and civil cases since then, however, in which he was represented by attorneys other than Cicero. (*See id.* at PageID # 2082–88.) This included criminal cases in 2011 and 2012 (*id.*; *see also* Gov't Ex. 8; Gov't Ex. 9A), his divorce from his wife Destiny Roberts in 2015 (R. 324, hearing tr. at PageID # 2085–86; Gov't Ex. 10A), and a breach of contract case in 2017 (R. 324, hearing tr. at PageID # 2087; Gov't Ex. 11). Additionally, in 2017, Roberts was charged with possessing weapons while under disability. (R. 324, hearing tr. at PageID # 2088–90.) That case was still pending as of August 2017, at which point Roberts was represented by local attorney Lawrence Henke. (*Id.*)

In 2014, Robert Caldwell retained Cicero to represent him in post-decree domestic relations matters concerning a custody dispute with Tawnney Caldwell ("Tawnney") over their three minor children. (*Id.* at PageID # 2100–01.) Cicero performed a conflicts check at the time, which identified no conflicts with the representation. (*Id.* at PageID # 2101.) In early 2015, Cicero became aware that Tawnney was in a relationship with Roberts. (*Id.* at PageID # 2102.) Cicero concluded that her representations of Roberts on the two criminal matters six years prior did not present a conflict of interest because there was no information pertaining to the previous representations that had any consequence to her representation of Caldwell. (*Id.* at PageID # 2102–03.) By 2015, Roberts was aware that Cicero represented Robert Caldwell in the domestic relations matter. (*Id.*) Neither he nor Tawnney raised any claim that Cicero was conflicted. (*Id.*)

3

In February 2017, Cicero spoke to Roberts in her capacity as Caldwell's attorney to inquire whether Roberts would serve as a witness or provide information that might be useful to Caldwell's custody case against Tawnney. (*Id.* at PageID # 2097–98; *see also* R. 337, hearing tr. at PageID # 2226.) Cicero made it clear to Roberts in that conversation that she was representing Caldwell and that she wanted Roberts to be a witness in the custody case. (*Id.* at PageID # 2104.) Roberts did not provide any helpful information to Cicero at the time, and Cicero had no further contact with Roberts until August 8, 2017 following the Jamestown stalking incident. (*Id.* at PageID # 2098.)

In July 2017, the domestic relations court designated Robert Caldwell as the residential and custodial parent for his three minor children and barred Roberts, who was then facing weapons charges, from having any contact with the minor children. (*See* Gov't Ex. 13, at 14; *see also* R. 337, hearing tr. at PageID # 2214.)

On August 5, 2017, Roberts, aided and abetted by Tawnney, attempted to kill Caldwell in Jamestown, Ohio. (*See* Gov't Ex. 14, at 7–12.) In a series of text messages, Roberts, pretending to be "Debbie Brown," lured Caldwell to an abandoned farmhouse. (*Id.*) When Caldwell arrived near the farmhouse, Roberts appeared brandishing a firearm. (*Id.*) Caldwell recognized Roberts, fled, and called 911. (*Id.*) Roberts briefly gave chase in his car, before turning and driving away. (*Id.*) Using the "Debbie Brown" phone number, Roberts then texted Caldwell "Your [sic] a bitch bob." (*Id.*)

Three days later, on August 8, 2017, Caldwell filed a petition for a civil stalking protection order against Roberts in the Greene County Court of Common Pleas based on Roberts' attempt to lure him to the abandoned farmhouse and kill him. (Gov't Ex. 13.) Cicero did not assist in the preparation of the petition. (R. 337, hearing tr. at PageID # 2215.) On the same day, Cicero, acting

4

in her capacity as Caldwell's attorney, prepared and filed an *ex parte* motion in the Montgomery County domestic relations court requesting an immediate suspension of Tawnney's parenting time. (Gov't Ex. 14.) The motion alleged that, in addition to the attempt on Caldwell's life on August 5, Roberts had also knowingly violated the no contact order on August 4 when he pretended to be Tawnney's brother to induce a social worker to leave one of the minor children in his care. (*Id.*)

In the evening of August 8, 2017, Caldwell spoke to Roberts on the phone and recorded the conversation. (Gov't Ex. 1 (audio recording); Gov't Ex. 2 (transcript).) On the call, Roberts told Caldwell that he wanted to discuss something "important." (Gov't Ex. 2, at 2.) Before Roberts could disclose the important information, Caldwell confronted him about the Jamestown stalking incident. (*Id.*) Roberts became agitated, called Caldwell an expletive, and told him to "shut [his] . . . mouth for a minute" so he could share the information. (*Id.*) Roberts said that he wanted to give Caldwell "the goddamned game," but that Caldwell needed to "[s]hut up for a minute and listen." (*Id.*) Caldwell responded, "Well go ahead man. I'm listening." (*Id.* at 3.) Roberts was still agitated, however, and told Caldwell he would instead pass the information to Cicero and not directly to Caldwell: "Listen man, we're not going to talk about it like this. Uh, where's Lori at? I want, I'll tell Lori all, all the details, man." (*Id.*) Caldwell told Roberts that he would arrange to have Cicero call Roberts, to which Roberts replied, "I'm doing you a . . . favor here too, asshole." (*Id.* at 4.)

After hanging up with Roberts, Caldwell called Cicero and gave her the phone number to reach Roberts. Caldwell explained to Cicero that Roberts had asked to speak to her and that he had indicated he would tell her "everything." (*Id.* at 5.) Cicero confirmed that she would call Caldwell back after speaking to Roberts. (*Id.*)

5

Cicero then called Roberts in her capacity as Caldwell's attorney using the phone number Caldwell provided. (R. 324, hearing tr. at PageID # 2113.) Cicero understood (1) that Roberts was reaching out to her in her capacity as Caldwell's lawyer to provide information that might prove useful in Caldwell's ongoing custody dispute; and (2) that he was providing this information to her rather than to Caldwell directly because Caldwell and Roberts were arguing. (R. 337, hearing tr. at PageID # 2226, 2257–58, 2261.)

The phone call lasted approximately 40 minutes. (R. 324, hearing tr. at PageID # 2113.) On the call, Cicero explicitly told Roberts that she was not his lawyer and made it clear to him that she was representing Caldwell, not him. (R. 337, hearing tr. at PageID # 2260–61.) Roberts expressed no confusion on this point as he had reached out to Cicero precisely because she was Caldwell's attorney and he wanted to provide her the "keys to the kingdom" regarding the custody case. (*Id.* at PageID # 2226, 2229, 2261.)

Roberts did not say anything to Cicero on the phone call that led her to believe that he was reaching out for legal representation or advice. (R. 324, hearing tr. at PageID # 2114.) When Roberts expressed a concern for his physical safety, Cicero told him he should contact his defense lawyer, Lawrence Henke, who was representing him on his weapons charge and that he should go to the police. (R. 337, hearing tr. at PageID # 2241.) Cicero explained that she did not represent Roberts, but that she could facilitate him turning himself in, as she recognized that law enforcement might find his claim that he feared for his life incredible. (*Id.* at PageID # 2241–42, 2262.) Cicero also testified that telling Roberts to turn himself in was not legal advice, but rather an attempt to protect her client from future harm from Roberts. (*Id.* at PageID # 2247–48.)

Roberts never expressed any indication or intention that Cicero should keep the contents of the phone call confidential. (R. 324, hearing tr. at PageID # 2114; R. 337, hearing tr. at PageID

6

# 2259–61.) To the contrary, he requested that Cicero record the phone call so that there would be a record in case anything happened to him. (R. 337, hearing tr. at PageID # 2259–61.) Consistent with her understanding that the communication was not confidential, Cicero disclosed the content of her communications with Roberts to various law enforcement officers, including individuals from the Riverside Police Department, the F.B.I., and the U.S. Attorney's Office. (R. 324, hearing tr. at PageID # 2115–17.)

## II. Argument

### A. Legal standard

Claims of attorney-client privilege are governed by federal common law. *See* Fed. R. Evid. 501; *Upjohn v. United States*, 449 U.S. 383, 389 (1981); *see also Guy v. United Healthcare Corp.*, 154 F.R.D. 172, 177 & n.3 (S.D. Ohio 1993). The essential elements of the privilege are:

> (1) Where legal advice of any kind is sought (2) from a professional legal adviser in his capacity as such, (3) the communications relating to that purpose, (4) made in confidence (5) by the client, (6) are at his instance permanently protected (7) from disclosure by himself or by the legal adviser, (8) except the protection be waived.

*Fausek v. White*. 965 F.2d 126, 129 (6th Cir. 1992). *Id.* The party asserting attorney-client privilege bears the burden of establishing that the privilege applies. *Id.* Moreover, because the privilege reduces the amount of information otherwise available, the privilege is narrowly construed and applies "only to the extent it serves the broader public interest." *Id.*; *United States v. Collis*, 128 F.3d 313, 320 (6th Cir. 1997); *see also In re Columbia*, 293 F.3d 289, 294 (6th Cir. 2002) ("The privilege 'applies only where necessary to achieve its purpose and protects only those communications necessary to obtain legal advice.'" (quoting *In re Antitrust Grand Jury*, 805 F.2d 155, 162 (6th Cir.1986))).

An individual's "subjective belief that he is represented is not alone sufficient to create an attorney-client relationship." *Under Seal v. United States (In re Grand Jury Subpoena: Under*

7

*Seal)*, 415 F.3d 333, 339–40 (4th Cir. 2005) (citing *United States v. Keplinger*, 776 F.2d 678, 701 (7th Cir. 1985)). Rather, the party asserting privilege must show that the individual's subjective belief that an attorney-client relationship existed was objectively reasonable under the circumstances. *See id.* (holding communications were not privileged because there was "no evidence of an objectively reasonable, mutual understanding that the appellants were seeking legal advice from the investigating attorneys or that the investigating attorneys were rendering personal legal advice"). The party asserting privilege must also demonstrate a reasonable expectation of confidentiality in the communication. *Accord United States v. Robinson*, 121 F.3d 971, 976 (5th Cir. 1997); *see also Pontikos v. American Med. Tech.*, No. 1:20-cv-2163, 2021 WL 634999, at *2 n. 17 (N.D. Ohio Feb. 18, 2021) (collecting cases).

      B.      <u>The August 8, 2017 communications are not protected by attorney-client privilege.</u>

Lori Cicero's August 8, 2017 phone conversation with Roberts is not shielded by attorney-client privilege. Roberts was not talking to Cicero in a capacity as a lawyer for him, was not seeking legal advice, and did not intend for the communication to be confidential. Rather, the purpose of the call was to potentially provide Cicero, in her capacity as Caldwell's lawyer, relevant information to be used publicly in Caldwell's custody case.

First, the attorney-client privilege does not apply because Cicero and Roberts were not in an attorney-client relationship and Roberts was speaking to Cicero in her capacity as Caldwell's attorney, not his attorney. Cicero testified that she made it explicitly clear on the phone call to Roberts that she was not his lawyer and that she was representing Caldwell. (R. 337, hearing tr. at PageID # 2226, 2229, 2260–61.) Roberts expressed no confusion on this point and did not say anything on the phone call to indicate he was reaching out for legal representation or advice. (*Id. see also* R. 324, hearing tr. at PageID # 2114.) Moreover, when Roberts expressed a concern for his personal safety, Cicero reiterated that she was not his lawyer and that he should contact the

8

defense counsel who was then representing him on his pending weapons charge. (R. 337, hearing tr. at PageID # 2241.) Accordingly, even if Roberts claimed a *subjective* belief that Cicero was acting as his lawyer on the call, that belief would not be objectively reasonable in light of Cicero's unequivocal statements to Roberts on the call and the circumstances surrounding the call. *Accord In re Grand Jury Subpoena*, 415 F.3d at 339–40 (holding claim of privilege based on purported attorney-client relationship with investigating attorneys was not reasonable where attorneys told appellant he could retain his own counsel and there was no evidence that appellant solicited legal advice from investigating attorneys).

Cicero's prior representations of Roberts and his family members likewise do not support his claim of privilege. Those representations do not provide an objectively reasonable basis to infer that an attorney-client relationship existed at the time of the call, let alone a basis sufficient to rebut Cicero's repeated, explicit disclaimers to Roberts on the call that no attorney-client relationship existed between them. Nothing in the prior representations provides any basis to conclude that any attorney-client relationship continued past January 2009. *Cf. Artromick Intern'l v. Drustar, Inc.*, 134 F.R.D. 226, 230 (S.D. Ohio 1991) (noting that "the law will imply an end to the relationship where it would be objectively unreasonable to continue to bind the parties to each other"). Both prior representations were on discrete, criminal matters and both concluded in January 2009—more than eight years prior to the August 2017 phone call. Because Cicero was court-appointed counsel, each representation was limited to the specific charges. Cicero never entered into any retainer or fee agreement with Roberts, let alone any agreement that would extend the attorney-client relationship eight years into the future over a completely unrelated matter. Any reliance on the prior representation is also misplaced in light of the fact that Roberts had several intervening

9

attorneys in various civil and criminal cases and was being represented by local attorney Lawrence Henke on pending criminal defense charges at the time of the call.

Second, Roberts' claim of privilege also fails because the record establishes that he sought out Cicero precisely because she was Caldwell's lawyer and that the purpose of the call was to provide Cicero information for Caldwell's custody case, not to solicit legal advice for himself. Several months prior to the call, Cicero had reached out to Roberts in her capacity as Caldwell's attorney to see if he would share information that could benefit Caldwell's case. While he did not provide information at that time, Roberts indicated to Caldwell on the recorded August 8 phone call that he now had important information to disclose to him. When Roberts became displeased with Caldwell's attitude, he asked to talk to Cicero as an intermediary. (Gov't Ex. 2, at 3.) He further indicated to Caldwell that he was doing him a "favor" and that he would tell Cicero "all the details." (*Id.* at 3–4.) Cicero likewise understood that the purpose of the call was for Roberts to provide information that would be helpful to the custody case. (R. 337, hearing tr. at PageID # 2226, 2257–58, 2261.) Because the predominant purpose of the call was to disclose information to Caldwell's lawyer, and not to solicit legal advice from his own lawyer, the communications are not attorney-client privileged. *Cf. United States v. Dakota*, 197 F.3d 821, 825 (6th Cir. 1999) (communications with defendant and attorney for Indian tribe were not privileged where there was no evidence that attorney acted in a capacity other than that of tribal attorney); *Henson v. State*, 261 P.2d 916, 921–22 (Okla. Crim. App. 1953) (holding that privilege did not apply where defendant reached out to attorney representing an individual in a civil dispute with defendant as the attorney was acting as an intermediary to settle differences between his client and defendant).

Third, the privilege also does not apply because Roberts has failed to carry his burden to show that the communications with Cicero were intended to be kept confidential. *Cf. Robinson*,

121 F.3d at 976 (noting that the "assertor of privilege must have a reasonable expectation of confidentiality"). Cicero testified that Roberts expressed no desire to keep the communication confidential. To the contrary, he requested that she record the conversation so that the contents of the communication could be preserved and shared. (R. 337, hearing tr. at PageID # 2259–61.) Moreover, any claim of confidentiality here is undercut by Roberts' statement on the recorded call that he wanted to talk to Cicero to provide her information to share with Caldwell and others. Consistent with her understanding that the call was not confidential, Cicero told Caldwell that she would call him back as soon as she got off the phone with Roberts and shared the contents of the communications with various law enforcement agencies following Caldwell's homicide. (R. 324, hearing tr. at PageID # 2115–17.)

In his motion, Roberts claims that Cicero's statement that he should turn himself in and accompanying offer to facilitate a surrender transformed the phone conversation into a privileged attorney-client communication. (R. 344, mem. at PageID # 2321.) Not so. Cicero prefaced her statement to Roberts that he should go to the police by reiterating that she was *not* his lawyer and that he should consult his defense counsel, Lawrence Henke:

> I told him to call Henke, his attorney, and to go to the police. I told him that I did not represent him and I could not help him. He was talking to the wrong person. I made that very clear to him.

(R. 337, hearing tr. at PageID # 2241.) Even if advising a fugitive to go to the police qualifies as privileged legal advice when made within the confines of a confidential communication between the fugitive and his lawyer, Cicero's statements are not privileged because she was explicitly not acting as his attorney and neither party had any expectation of confidentiality. *See United States v. Goldfarb*, 328 F.2d 280, 282 (6th Cir. 1964) (noting that privilege "is designed to enable a client to confide in *his* attorney" and that communications made to an attorney in her professional capacity by anyone other than her client are not privileged (emphasis added)); *see also Henson*,

11

261 P.2d at 921–22 (statements by attorney advising defendant of criminal consequences if defendant were to assault his client were not privileged because attorney and defendant were not in an attorney-client relationship).

In any event, Cicero's statement that Roberts should go to the police was neither legal advice about how to handle the pending stalking charges against him nor the predominant purpose of the communication. *Cf. Alomari v. Ohio Dep't of Public Safety*, 626 F. App'x 558, 570 (6th Cir. 2015) (noting privilege only applies if the predominant purpose of the communication is to render or solicit legal advice and directing courts to consider the "relationship between advice that can be rendered only by consulting the legal authorities and advice that can be given by a non-lawyer"). Far from advising Roberts on his pending stalking charges, Cicero told him to go to the police in response to his non-legal concern that Tawnney might be planning to physically harm him (R. 337, hearing tr. at PageID # 2241, 2247–48, 2262) and in her capacity as Caldwell's lawyer in order to protect Caldwell from future harm from Roberts (*id.* at PageID # 2247–48). And, as noted above, both Cicero's testimony and Roberts' statements on the recorded call make clear that the predominant purpose of the call was to provide Cicero potential information to be disclosed publicly, not to solicit legal advice on the stalking charges he was facing. Indeed, Cicero's multiple disclaimers to Roberts that she was not his lawyer made clear that providing him legal advice was not any part of the communication, let alone its predominant purpose.

//
//
//
//
//

### III. Conclusion

The Court should deny Roberts' motion in limine for the foregoing reasons.

Respectfully submitted,

VIPAL J. PATEL
Acting United States Attorney


s/Kevin Koller
KEVIN KOLLER (NY 5180609)
AMY M. SMITH (0081712)
SHEILA G. LAFFERTY (0042554)
Assistant United States Attorneys
Attorneys for Plaintiff
221 E. Fourth Street, Suite 400
Cincinnati, Ohio  45202
Office:  (513) 694-3711
E-mail: Kevin.Koller@usdoj.gov
E-mail: Amy.Smith2@usdoj.gov
E-mail: Sheila.Lafferty@usdoj.gov

### CERTIFICATE OF SERVICE

I hereby certify that a copy of this Response was electronically filed and served upon all counsel of record via the CM/EMF system on this 24th day of August, 2021.

s/Kevin Koller
KEVIN KOLLER (NY 5180609)
Assistant United States Attorney
